IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AARON SCHUELKE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 11-519 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff, Aaron Schuelke, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for supplemental
security income ("SSI") under Title XVI of the Social Security
Act, 42 U.S.C. §§ 1381-1383f.  Presently before the Court are
the parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's
motion for summary judgment will be granted, and the
Commissioner's cross-motion for summary judgment will be denied.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI on May 19, 2008,
alleging disability since April 1, 2008, due to bipolar disorder
and paranoid schizophrenia resulting in "mood swings."  (R. 119-
25, 150).  Plaintiff's application was denied, and he requested
a hearing before an administrative law judge ("ALJ").  (R. 67-

69).  Plaintiff, who was represented by counsel, testified at
the hearing which was held on October 21, 2009.  A vocational
expert ("VE") also testified.  (R. 41-59).

The ALJ issued a decision on December 10, 2009, denying
Plaintiff's application for SSI based on his determination that,
despite severe impairments, Plaintiff retained the residual
functional capacity ("RFC") to perform work existing in
significant numbers in the national economy.[1]  (R. 11-40).
Plaintiff's request for review of the ALJ's decision was denied
by the Appeals Council on February 24, 2011.  (R. 1-5, 112-18).
Thus, the ALJ's decision became the final decision of the
Commissioner.  This appeal followed.

**BACKGROUND**

Plaintiff's testimony during the hearing before the ALJ may
be summarized as follows:

Plaintiff was born on August 4, 1987.[2]  With respect to
education, Plaintiff is a high school graduate.  (R. 46).
Plaintiff, who resides with his parents, has one child and
shares custody with the child's mother.  (R. 50-51).  At the
time of the hearing, Plaintiff was working "[u]nder the table a
little bit."  Specifically, Plaintiff shoveled coal into buckets

---

[1] The Social Security Regulations define RFC as the most a disability claimant
can still do despite his or her physical or mental limitations.  See 20
C.F.R. § 416.945(a).
[2] Plaintiff was 22 years old on the day of the hearing.

2

"a couple hours a week" for a neighbor who heats his home with coal.[3]   (R. 46).

Plaintiff suffers from rapid mood swings which he described as follows: "[y]ou're fine one moment and the next moment you're way high or way low." Stress exacerbates Plaintiff's mood swings.  At the time of the hearing, Plaintiff was taking the following prescribed medications: Depakote, Haldol and Cogentin.[4] Plaintiff experiences side effects from one of the medications; however, the side effects are offset by one of his other medications.[5]  When Plaintiff is not taking his prescribed medications, mood swings affect his ability to concentrate and sleep.  On the other hand, when he is compliant with his medication regime, Plaintiff's mood swings are "[a]lmost non-existent."  At times, Plaintiff has been unable to get his prescribed medications due to lapses in his medical insurance. (R. 47-49, 52).

---

[3] Plaintiff's employment history is very limited.  In an Adult Disability Report completed on June 5, 2008, Plaintiff reported that he worked for a moving company, a carpet company and a retail store in 2007, and that he worked as a laborer through a temporary employment agency in March and April of 2008.  (R. 152).

[4] Depakote is used, among other reasons, to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder), a disease that causes episodes of depression, episodes of mania, and other abnormal moods.  Haldol is used to treat psychotic disorders (conditions that cause difficulty telling the difference between things or ideas that are real and things or ideas that are not real).  Cogentin is used to treat the symptoms of Parkinson's disease and tremors caused by other medical problems or drugs.   www.nlm.nih.gov/medlineplus/druginfo ("MedlinePlus").

[5] Plaintiff indicated in the Adult Disability Report completed on June 5, 2008, that he was prescribed Cogentin to counteract the side effects of Haldol. (R. 156).

3

In the past, Plaintiff has had drug and alcohol problems.
At the time of the hearing, Plaintiff had not used marijuana or
cocaine for 5 years and he drank beer only sporadically; that
is, to "mellow out" when his medical insurance has lapsed and he
cannot get his prescribed medications.  (R. 49-50).

With respect to activities, Plaintiff washes the dishes and
mows the lawn, and he takes care of his son from Thursday
through Sunday each week when he has custody.[6]  Plaintiff does
not watch television; however, he reads books.  (R. 51-52).

**VE TESTIMONY**

During the hearing on Plaintiff's application for SSI, the
ALJ asked the VE to assume a hypothetical person of Plaintiff's
education and work experience who can perform light work with
the following requirements: (1) a sit/stand option; (2) the
ability to change positions every 30 minutes; (3) only simple,
routine, repetitive tasks; (4) no fast paced production; (5)
relatively few workplace changes; (6) only simple work
decisions; (7) relatively low stress; and (8) only limited or
occasional interaction with supervisors, coworkers and the
general public.  The ALJ then asked the VE whether the
hypothetical person could perform any jobs existing in
significant numbers in the national economy.  The VE responded
affirmatively, identifying the jobs of a night or gate guard, an

---

[6] At the time of the hearing, Plaintiff's son was 16 months old.  (R. 50).

4

inspector/checker/examiner and a packing line worker.  (R. 56-
57).  If, in addition, the hypothetical person was off task 50%
of the time due to mood swings resulting in an inability to
concentrate on even simple, routine, repetitive jobs, the VE
testified that all jobs would be eliminated.  (R. 57).

**MEDICAL EVIDENCE**

The administrative record in this case includes the
following medical evidence:[7]

On September 20, 2006, Plaintiff was admitted to Butler
Memorial Hospital for increased paranoid ideations, irritability
and exacerbation of his manic depressive illness due to the time
of year (fall).[8]  At the time, Plaintiff, who was 19 years old,
was on probation for theft and arson.  Plaintiff reported that
he had not used drugs or alcohol since his release from the
Keystone Adolescent Center where he had been a resident for 2
years.[9]  The impression following Plaintiff's initial psychiatric
evaluation included bipolar disorder, depression, mixed
substance abuse in remission, juvenile antisocial behavior,

---

[7] There is evidence in the administrative record pertaining to Plaintiff's
treatment for back problems and other physical conditions.  Because
Plaintiff's arguments in support of his motion for summary judgment pertain
solely to his mental impairments, the Court's summary of the evidence will be
limited to mental health treatment, assessments and observations.  Also,
evidence predating Plaintiff's alleged onset date of disability of April 1,
2008 is included for historical purposes.

[8] This admission apparently was Plaintiff's second psychiatric admission.  (R.
182).  There is no evidence in the administrative file relating to his first
psychiatric admission.

[9] With regard to drug use, Plaintiff reported that he had "used everything" and
that his drugs of choice had been marijuana, cocaine and narcotics.  (R.
182).

relationship problems (conflicts with brother) and rule out residual attention deficit disorder.  On the Global Assessment of Functioning ("GAF") scale, Plaintiff was assigned a range of 35 to 65.[10]  Plaintiff was treated with Remeron, Lamictal and Geodon.[11]  At the time of his discharge from the hospital on September 26, 2006, Plaintiff's affect was brightening; he was social and visible with no suicidal ideations or psychotic symptoms; and he was sleeping well.  Plaintiff was instructed to follow-up at the Irene Stacy Community Mental Health Center ("ISCMHC").  (R. 178-84).

On October 31, 2006, Plaintiff presented to Butler Memorial Hospital with "re-emergent suicidal ideation and psychotic symptoms in the context of having to discontinue his medications

---

[10] The GAF scale is used by clinicians to report an individual's overall level of functioning.  The scale does not evaluate impairments caused by physical or environmental factors.  The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness.  The highest possible score is 100, and the lowest is 1.  A GAF score between 31 and 40 denotes "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...;" a GAF score between 41 and 50 denotes "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...;" a GAF score between 51 and 60 denotes "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...;" and a GAF score between 61 and 70 denotes "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000), at 34 (bold face in original) ("DSM-IV-TR").

[11] Remeron is used to treat depression.  It works by increasing certain types of activity in the brain to maintain mental balance.  Lamictal is used to increase the time between episodes of depression, mania and other abnormal moods in patients with bipolar disorder.  Geodon is used to treat symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions).  It is also used to treat episodes of mania or mixed episodes in patients with bipolar disorder.  MedlinePlus.

[upon] expiration of his prescription[s]."  Plaintiff reported

that he had to cancel his appointment at the ISCMHC following

his discharge from the hospital on September 26, 2006.  As a

result, he could not get his prescriptions refilled.[12]

Plaintiff's medications were re-started with no adverse effects.

At the time of his discharge from the hospital on November 3,

2006, Plaintiff's mood was stable; he denied suicidal or

homicidal ideation; he denied auditory or visual hallucinations;

his sleep, appetite and energy reserves were within normal

limits; and he was able to identify coping mechanisms.

Plaintiff's GAF scores upon admission and at the time of

discharge were rated 35 (some impairment in reality testing or

communication or major impairment in several areas such as work,

family relations, judgment, thinking or mood) and 50 (serious

symptoms or any serious impairment in social or occupational

functioning), respectively.  (R. 194-200).

On March 15, 2007, Plaintiff was evaluated at the ISCMHC

for the purpose of re-opening his case and obtaining

prescription refills.[13]  Plaintiff denied suicidal ideation but

reported feeling homicidal "toward everyone."  He also reported

auditory hallucinations and mood swings and rated his

_____

[12] According to Plaintiff's mother, he was not classified as an active case at
the ISCMHC due to an "administrative glitch."  Therefore, he could not
schedule an appointment.
[13] Plaintiff was accompanied to the evaluation by his in-home worker from Child
and Adolescent Clinical Associates where Plaintiff received counseling three
times a week pursuant to a Court order.  (R. 236-37).

irritability level a 9 on a scale of 1 (lowest) to 10 (highest).
Following a mental status examination, Plaintiff was diagnosed
with schizoaffective disorder, rule out chronic paranoid
schizophrenia, a learning disorder NOS and moderate to severe
psychosocial stressors.  His GAF score was rated a 30.[14]  While
Plaintiff reported some benefit from his previous medications,
he also reported that the medications caused sleep difficulties.
Because Plaintiff had experienced increased auditory
hallucinations since he stopped taking his medications, a trial
of Depakote was recommended.  In the event psychotic symptoms
continued to be problematic, the plan was to reintroduce an
antipsychotic medication in addition to the Depakote.[15]  (R. 236-
40).

    During a medication check at the ISCMHC on April 4, 2007,
Plaintiff reported that he noticed improvement on the Depakote;
he was spending time at the library and socializing with
friends; he was sleeping well and not acting on urges; his mood

---

[14] A GAF score of 30 denotes the following: "**Behavior is considerably
influenced by delusions or hallucinations OR serious impairment in
communication or judgment ... OR inability to function in almost all areas.**"
DSM-IV-TR.

[15] The records relating to Plaintiff's evaluation at the ISCMHC on March 15,
2007, noted that his treatment by this facility was complicated by the fact
that Plaintiff was receiving "rather intensive therapeutic services" through
another agency which, presumably, was Child and Adolescent Clinical
Associates ("CACA").   See Footnote 13.   Representatives of the agencies
discussed the situation and decided that Plaintiff would be treated by the
ISCMHC until CACA replaced its psychiatrist who had left.  When the
psychiatrist was replaced, which was anticipated to occur in approximately a
month, Plaintiff's psychiatric treatment would be transitioned from the
ISCMHC back to CACA.  (R. 239).

was steady; and he had prescription medication coverage. Because Plaintiff was responding to the Depakote, the dosage was increased. (R. 235).

Plaintiff's next medication check at the ISCMHC took place on June 5, 2007. Plaintiff complained of sleep difficulties, a depressed mood (7 on a scale of 1 to 10), auditory hallucinations and racing thoughts. Plaintiff reported that he had a job but lost it due to calling off excessively, and that he had to get another job or return to house arrest. Geodon was added to Plaintiff's medication regime. (R. 234).

During a medication check at the ISCMHC on July 17, 2007, Plaintiff rated his mood a 5 on a scale of 1 to 10. Plaintiff stated that his medications were not working; he was irritable and confrontational; and his caseworker from CACA indicated he was self-medicating. Plaintiff left the medication check early to smoke a cigarette with instructions to take his medications as prescribed.[16] On July 24, 2007, Plaintiff was instructed to stop taking Geodon and start taking Risperdal.[17] (R. 233).

Plaintiff continued to rate his mood a 5 on a scale of 1 to 10 during his medication check at the ISCMHC on August 14, 2007. Plaintiff reported feeling better on Risperdal and indicated

---

[16] The ISCMHC's record of this medication check notes that CACA still did not have a psychiatrist. (R. 233). As a result, Plaintiff continued to be treated at the ISCMHC.

[17] Risperdal is used to treat symptoms of schizophrenia. It is also used to treat episodes of mania in people with bipolar disorder. MedlinePlus.

9

that he needed a job and was applying at Walmart.  Plaintiff

also reported that he had a girlfriend.  Plaintiff was described

as pleasant with no hallucinations and a stable mood.  Depakote

and Risperdal were continued.  (R. 232).

The report of a Nursing Assessment at the Butler County

Prison on October 15, 2007, indicates that Plaintiff reportedly

had not taken Depakote and Risperdal since July 2007.  The nurse

listed Plaintiff's diagnoses as bipolar disorder and paranoid

schizophrenia, noting that Plaintiff also had a history of drug

abuse.  At the time, Plaintiff had no acute complaints.  (R.

251).

A psychiatry progress note of the Butler County Prison in

early January 2008 indicates that Plaintiff was being seen at

his request to get back on Depakote and Risperdal.  Plaintiff

complained of increasing depression with anger, irritability,

"spotty" sleep and a poor appetite.  With respect to his mental

status examination, Plaintiff was described as agitated,

depressed and anxious.  Plaintiff denied suicidal ideation but

reported homicidal ideation "about every day" with regard to

"people in general."  (R. 252).

During a mental health session at the Butler County Prison

on January 15, 2008, Plaintiff gave the therapist a history of

his mental health problems.  The therapist noted, among other

things, that Plaintiff laughed at his own statements and

attempted to magnify his symptoms.  Plaintiff's assessment was

impulse control disorder NOS.  Depakote and Risperdal were

prescribed for Plaintiff.  (R. 250).

On August 14, 2008, Suzanne Houk, Ph.D. performed a

consultative psychological disability evaluation of Plaintiff.

With regard to his history, Plaintiff informed Dr. Houk that he

was initially placed on juvenile probation at age 13; that due

to mood swings, depression, anger and violent tendencies, his

probation officer referred him to counseling which was provided

by various facilities including the Mars Home for Youth; that

between the ages of 13 and 19, he had been placed in 15 or 16

facilities; that he had been admitted to Butler Memorial

Hospital in September and November 2006 for his psychiatric

disorders;[18] that he was incarcerated at the Butler County Prison

from November 2007 to February 2008 and was currently on

juvenile probation and adult parole;[19] that he was being treated

at the ISCMHC and prescribed Depakote, Haldol and Cogentin; that

his mood at that time was "irritable and cranky and overall

paranoid, suspecting everybody of everything;" that he had

---

[18] Plaintiff described these admissions to Dr. Houk as "a complete manic
psychotic break, I knew if I didn't get hospitalized somebody's life style
was getting rearranged."  (R. 273).
[19] Plaintiff informed Dr. Houk that he has four felony juvenile convictions (2
arsons, carrying a concealed weapon in school and criminal trespass) and two
adult misdemeanor convictions (possession of an unregistered weapon and
possession of a controlled substance).  (R. 273).

nightmares of people dying;[20] that his ability to sleep "depends
on the day" and "how much bullshit [he has] to put up with;"
that his concentration was poor;[21] that he attempted suicide on
two occasions (ages 15 and 16) but a friend intervened; that he
preferred to be alone and was "tired of dealing with people;"
that he had periods of hypomania during which his thoughts
raced, he paced or rocked, he had increased energy and he was
angry and irritable and walked around looking for someone to
start an argument with him;[22] that his medications helped slow
his thoughts; that it was a "fact of life" that people plotted
against him; that he occasionally heard voices and had visual
hallucinations; and that he had anxiety attacks when he was
around loud noises, crowds or sudden movements.[23]  Dr. Houk's
diagnostic impressions included bipolar disorder, NOS,
psychosis, NOS, antisocial personality disorder, rule out
schizoaffective disorder and rule out post-traumatic stress

---

[20] At the end of the evaluation, Plaintiff stated that he had seen a number of
friends die in front of him and asked Dr. Houk if she had "ever had someone's
brains" on her.  (R. 273-74).
[21] As to concentration, Plaintiff specifically stated: "[it] sucks, my mind
races, I can't keep track of anything."  (R. 274).
[22] Plaintiff reported that he had a manic episode while incarcerated during
which he beat on the walls because "everybody was f***ing with me."
Plaintiff also reported that he had been in over 20 fights and did not know
the extent of injury inflicted on others because he "didn't stay around to
ask."  Plaintiff added that he did not feel guilty for getting in fights or
hurting others because "I don't go looking for problems."  (R. 274).
[23] With regard to the mental health history of his family, Plaintiff informed
Dr. Houk that his father had been diagnosed with bipolar disorder; his older
brother, who was in the Marines, is bipolar and psychotic; and his younger
brother, who was incarcerated in the State penitentiary at the time, is a
sociopath.  He also informed Dr. Houk that his father and older brother
abused alcohol.  (R. 275).

disorder, and she described Plaintiff's prognosis as "highly guarded given the coupling of personality traits and other psychiatric symptoms."   (R. 270-77).

In a questionnaire completed in connection with her consultative disability examination of Plaintiff, Dr. Houk rendered the opinion that Plaintiff was markedly limited in the following work-related areas:[24] (1) the ability to understand, remember and carry out detailed instructions; (2) the ability to make judgments on simple work-related decisions; (3) the ability to interact appropriately with the public, supervisors and co-workers; and (4) the ability to respond appropriately to work pressures in a usual work setting.   (R. 270).

On August 29, 2008, Kerry Brace, Psy.D., a non-examining State agency psychological consultant, completed a Psychiatric Review Technique Form for Plaintiff based on a review of his administrative file.  Dr. Brace opined that Plaintiff was mildly restricted with regard to activities of daily living; had moderate difficulties in social functioning and concentration; and had never experienced an episode of decompensation of an extended duration.[25]   (R. 303).   In rendering the foregoing opinions, Dr. Brace noted: Plaintiff's two brief

---

[24] A marked limitation means more than moderate but less than extreme.   (R. 17).

[25] Repeated episodes of decompensation, each of extended duration, mean three episodes within 1 year, or an average of one episode every 4 months, each lasting for at least 2 weeks.   (R. 17).

13

hospitalizations in 2006 occurred as a result of Plaintiff not taking his prescribed medications; a mental health assessment at the Butler County Prison indicated that Plaintiff was magnifying his symptoms; during his recent consultative disability examination by Dr. Houk, Plaintiff reported only infrequent minor auditory hallucinations and only one occasion of a visual hallucination; Plaintiff was cooperative in answering Dr. Houk's questions; although his recall was limited, Plaintiff's concentration during the mental status test performed by Dr. Houk was intact; and Plaintiff reported being able to clean, cook, pay bills and maintain hygiene. As a result, Dr. Brace concluded that Plaintiff's mental impairments did not appear to be so severe as to prevent him from working in unskilled settings without much demand for interpersonal interaction.  (R. 305).

In a Mental RFC Assessment completed by Dr. Brace the same day, she opined that Plaintiff was not significantly limited or only moderately limited in all work-related mental activities with the exception of the ability to understand, remember and carry out detailed instructions and the ability to interact appropriately with the general public.  In those areas, Dr. Brace opined that Plaintiff was markedly limited.  With regard to the difference in her opinions and the opinions of Dr. Houk

regarding the severity of the work-related limitations resulting

from Plaintiff's mental impairments, Dr. Brace stated:

> ... the examining source statements regarding his abilities
> in the areas of making personal and social adjustments and
> other work related activities are not consistent with all
> of the medical and non-medical evidence in the claims
> folder.   The evidence provided by the examining source
> reveals only a snapshot of the claimant's functioning and
> is an overestimate of the severity of his limitations.
> Therefore, great weight cannot be given to the examining
> source's opinion....

(R. 288-91).

Plaintiff underwent a psychiatric evaluation at Wellness

Works ("WW") on November 3, 2008.  The evaluation report,

however, is limited to the information provided by Plaintiff

regarding his personal history, presenting problems and past

treatment.  The sections of the report relating to Plaintiff's

mental status examination and the evaluator's diagnoses are

blank.  At the time, Plaintiff was not taking any medications

for his mental impairments.  (R. 348-51).

During a therapy session at WW on November 10, 2008,

Plaintiff's mood was described as "severe w/psych. features,"

and the therapist noted that Plaintiff reported panic attacks.

Plaintiff's medication treatment was described as "in process."

(R. 347).

On November 19, 2008, Plaintiff was admitted to Butler

Memorial Hospital for psychiatric problems a third time.

Plaintiff presented with increasing depression, irritability due

to multiple psychosocial stressors and discontinuation of his
bipolar medication about a year and a half before the
admission.[26]  The impressions of the initial evaluator included
bipolar disorder, depression, generalized anxiety disorder with
panic, adult antisocial behavior and non-adherence to outpatient
treatment.  The evaluator rated Plaintiff's GAF score between 45
(serious symptoms or any serious impairment in social or
occupational functioning) and 60 (moderate symptoms or moderate
difficulty in social or occupational functioning), and Plaintiff
was restarted on Depakote.  By the time of his discharge on
November 24, 2008, Plaintiff's mood had improved and he denied
suicidal or homicidal ideation.  Plaintiff, who left the
hospital against medical advice, was instructed to follow-up at
WW.  (R. 325-31).

During his therapy sessions at WW on December 2, December 8
and December 16, 2008, Plaintiff was described as mildly
depressed and moderately anxious.  (R. 344-46).  On December 23,
2008, Plaintiff's mood during his therapy session was described
as normal and his anxiety level as mild, although he did report
sleep problems and racing thoughts.  Six days later, Plaintiff's
mood and anxiety level during his therapy session were described

---

[26] As to Plaintiff's psychosocial stressors, he reported during the initial
neuropsychiatric evaluation that he had found boxer shorts and suspected his
girlfriend of infidelity; he was resigned to the fact that the relationship
was over; and he was having homicidal thoughts toward "whoever this boyfriend
might be."  (R. 330).

as mild, and Plaintiff reported that he was compliant with his medication regime.  The therapist also was noted that Plaintiff reported alcohol use.  (R. 342).

During a psychiatric evaluation at WW on January 2, 2009, Plaintiff denied symptoms of mania, suicidal or homicidal tendencies and perceptual distortions, and he reported that his sleep was within normal limits.  As to Plaintiff's mental status examination, Plaintiff was described as oriented x 3, fairly groomed and in no distress with spontaneous speech.  Plaintiff described his mood as "nuts."  His affect was intense; he was irritable; his insight and judgment were rated fair to poor; no gross cognitive deficits were noted; his psychomotor activity was normal and his IQ appeared to be normal.  Plaintiff's assessment included depressive disorder, NOS, impulse control disorder and antisocial personality disorder.  His GAF score was rated a 49 (serious symptoms or any serious impairment in social or occupational functioning).  (R. 339-41).  During therapy sessions at WW on January 6, January 13 and January 19, 2009, Plaintiff's mood was normal; his anxiety level was mild; he was medication compliant; and he reported occasional alcohol use. (R. 336-38).

Plaintiff did not return to therapy at WW until August 12, 2009.  At the time, Plaintiff's mood was manic; he was moderately anxious; he reported using alcohol; and he was not

compliant with his medication regime due to the loss of medical insurance.  The therapist noted that Plaintiff was drinking excessively, remained on parole and was not taking responsibility for his actions.  (R. 360).

During therapy sessions at WW on August 19, August 26 and September 4, 2009, the therapist described Plaintiff as mildly depressed and moderately anxious with occasional alcohol use. She noted that Plaintiff's medications were "in process."  (R. 357-59).

On September 11, 2009, Plaintiff was described as mildly depressed and severely anxious during his therapy session due to reported panic attacks.  Plaintiff also reported occasional alcohol use.  Plaintiff's medications continued to be described as "in process."  (R. 356).  During his next therapy session on September 18, 2009, Plaintiff continued to present as mildly depressed; however, his anxiety level was described as moderate and he apparently did not report continued panic attacks. Plaintiff denied alcohol use, and his medications continued to be described as "in process."  (R. 355).

The final three records of WW in the administrative file for therapy sessions on September 28, October 5 and October 13, 2009, indicate that Plaintiff continued to be mildly depressed with mild to moderate anxiety levels.  Plaintiff continued to deny alcohol use; and he was medication compliant.  (R. 352-54).

18

**ALJ'S DECISION**

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 423(d)(1). A claimant is considered unable to engage in any substantial gainful activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process. See 20 C.F.R. § 416.920(a)(4). The process was described by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\* \* \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. See 20 C.F.R. §§ 416.920(a)

through (c)(1989).  In the third step, the medical evidence
of the claimant's impairment is compared to a list of
impairments presumed severe enough to preclude any gainful
work.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt.
A)(1989).  If the claimant's impairment matches or is
"equal" to one of the listed impairments, he qualifies for
benefits without further inquiry.  § 416.920(d).  If the
claimant cannot qualify under the listings, the analysis
proceeds to the fourth and fifth steps.  At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience.  If the
claimant cannot do his past work or other work, he
qualifies for benefits.

                        *    *    *

493 U.S. at 525-26.

     The claimant bears the burden of establishing steps one

through four of the sequential evaluation process for making

disability determinations.  At step five, the burden shifts to

the Commissioner to consider "vocational factors" (the

claimant's age, education and past work experience) and

determine whether the claimant is capable of performing other

jobs existing in significant numbers in the national economy in

light of his or her RFC.  Ramirez v. Barnhart, 372 F.2d 546,

550-51 (3d Cir.2004).

     With respect to the ALJ's application of the five-step

sequential evaluation process in the present case, steps one and

two were resolved in Plaintiff's favor: that is, the ALJ found

that Plaintiff had not engaged in substantial gainful activity

since his alleged disability onset date of April 1, 2008, and

the medical evidence established that Plaintiff suffers from the

following severe impairments: bipolar disorder, depressive disorder, paranoid schizophrenia, anxiety disorder with panic, antisocial personality disorder, impulse control disorder and back complaints.  (R. 16).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, including the listings in 1.00 relating to the musculoskeletal system, Listing 12.03 (schizophrenic, paranoid and other psychotic disorders), Listing 12.04 (affective disorders), Listing 12.06 (anxiety-related disorders), Listing 12.08 (personality disorders) and Listing 12.09 (substance addiction disorders).  (R. 17-18).

Before proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform light work, except that (1) he must be afforded a sit/stand option and the ability to change positions every 30 minutes, (2) he is limited to simple, routine, repetitive tasks that are not fast-paced, (3) he is limited to simple work place changes in a low stress environment, and (4) he is limited to only occasional interaction with supervisors and the public. (R. 18-35).  The ALJ then proceeded to step four, finding that in Plaintiff has no relevant work history.  (R. 35).

Finally, at step five, considering Plaintiff's age, education, work experience, RFC and the VE's testimony, the ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy, including the jobs of a night guard, an inspector/checker and a packing line worker.  (R. 35-36).

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence.  Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

Plaintiff's initial argument in support of his motion for summary judgment relates to the ALJ's evaluation of the opinion evidence in the administrative file.  Specifically, Plaintiff asserts that the ALJ erred by giving more weight to the opinion of the non-examining State agency psychological consultant than the opinions of treating psychiatrists and the consultative psychological examiner.  After consideration, the Court agrees.[27]

I

It is well established that treating physicians' reports should be accorded great weight; that an ALJ may not make speculative inferences from medical reports; and that an ALJ is not free to employ his or her own expertise against that of a physician who presents competent medical evidence.  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999).  Moreover, the principle that an ALJ should not substitute his or her lay opinion for the medical opinion of experts is especially profound in cases involving mental disabilities.  Morales v. Apfel, 225 F.3d 310, 319 (3d Cir.2000).

Turning first to the opinions relating to Plaintiff's mental disorders that were rendered prior to April 1, 2008 (the alleged onset date of disability in this case), the ALJ gave

---

[27] In light of the Court's conclusion that the ALJ's evaluation of the opinion evidence was erroneous and requires reversal of his decision, Plaintiff's additional, related arguments concerning the ALJ's RFC assessment and the hypothetical question posed to the VE will not be addressed.

"minimal" or "virtually no weight" to such opinions.  According to the ALJ, the diagnoses and GAF assessments of the psychiatrists who treated Plaintiff during his psychiatric admissions at Butler Memorial Hospital in September and October-November 2006, as well as the diagnoses and GAF assessment of the psychiatrist who evaluated Plaintiff at the ISCMHC in March 2007, were (a) not supported by Plaintiff's "benign clinical findings" but, rather, based on Plaintiff's subjective complaints, and (b) inconsistent with other substantial evidence in the record, i.e., ER and chiropractic records relating to Plaintiff's treatment for various physical ailments during this time period.  (R. 18-21).

As to the psychiatrists' reliance on Plaintiff's subjective complaints, psychiatrists are highly trained in diagnosing mental disorders, and, in doing so, must necessarily rely on the statements of their patients.  Thus, the fact that the diagnoses and GAF assessments rendered by treating and evaluating psychiatrists prior to April 1, 2008 were based, in large part, on Plaintiff's subjective complaints does not provide a basis for the ALJ's rejection of the psychiatrists' opinions.  Simply put, this is a classic case of an ALJ impermissibly substituting his lay opinion for that of psychiatric experts who treated or examined Plaintiff.

As to the ALJ's rejection of Plaintiff's pre-April 1, 2008
diagnoses and GAF assessments based on the failure of ER and
chiropractic records prepared around the time the opinions were
rendered to mention abnormal psychiatric symptoms, the Court
agrees with Plaintiff that this fact provides little, if any,
support for rejecting the psychiatrists' opinions.  The records
were prepared in connection with Plaintiff's treatment by
medical doctors for physical complaints.  Physicians, with the
exception of those specializing in psychiatry, are totally
unqualified to diagnose psychological disorders.[28]  Ross v.
Shalala, 865 F.Supp. 286, 292 (W.D.Pa.1994).

**II**

The ALJ's stated reasons for totally disregarding the
records of the Butler County Prison concerning Plaintiff's
mental disorders for the period October 2007 to January 2008
(three months before the alleged onset date of disability) also
were improper.  (R. 21-22).  First, the ALJ observed that
Plaintiff was not compliant with his medications while
incarcerated.  This fact, however, is meaningless.  Plaintiff's

---

[28] The ALJ also engaged in impermissible speculation in rejecting opinion
evidence rendered prior to April 1, 2008.  Specifically, following his
initial evaluation at Butler Memorial Hospital for the psychiatric admission
on September 20, 2006, the psychiatrist rated Plaintiff's GAF score between
35 and 65.  In his decision, the ALJ states: "The extremely broad range of
GAF **seems** to indicate some ambiguity on the part of the psychiatrist
assigning the GAF as to the actual severity of the claimant's symptoms."
(emphasis added).  (R. 19).  It is just as likely the psychiatrist assigned a
GAF range to Plaintiff, rather than a single score, due to the nature of
bipolar disorder which causes individuals to experience alternating periods
of mania and depression during which the ability to function may vary.

ability to comply with a medication regime would have been beyond his control while he was in prison.  Second, the ALJ asserted that Plaintiff's mental status examination in early January 2008 failed to support his allegations of depression, irritability and anger.  Contrary to this assertion, the examiner specifically noted that Plaintiff presented with a depressed and anxious mood and that he was agitated.  These notations clearly were based on observation not Plaintiff's subjective complaints.  Finally, the ALJ noted that during a mental health session on January 15, 2008, the therapist indicated that Plaintiff was dramatic and attempted to magnify his symptoms.  As noted by Plaintiff, despite these notations, it is apparent the therapist believed he suffers from significant mental disorders.  Depakote (an anticonvulsive) and Risperdal (an antipsychotic) were prescribed for Plaintiff at this mental health session.[29]

### III

As noted previously, Dr. Houk, a psychologist, performed a consultative disability examination of Plaintiff and diagnosed

---

[29] The Court also notes that drama and symptom magnification are not necessarily inconsistent with Plaintiff's repeated diagnosis of bipolar disorder which causes episodes of mania.  Cf. Morales v. Apfel, 225 F.3d 310 (3d Cir.2000)(Mentions of malingering by two consultative examiners did not justify outright rejection of treating psychiatrist's opinion; despite observations of possible malingering, which is among the symptoms of antisocial personality disorder, one consultative examiner ultimately concluded claimant suffered from a personality disorder with explosive and anti-social features and the other consultative examiner gave claimant an IQ score that classified him as at least mildly mentally retarded).

him with bipolar disorder, psychosis and antisocial personality disorder. Like the previous diagnoses of the treating and examining psychiatrists, the ALJ gave "very little weight" to Dr. Houk's diagnoses. While the ALJ conceded the diagnoses were supported by some of Dr. Houk's clinical findings and consistent with Plaintiff's prior diagnoses, he declined to give this opinion evidence significant weight based on his own determination the diagnoses were not supported by Dr. Houk's clinical findings and appeared to be heavily based on Plaintiff's subjective complaints. Similarly, the ALJ gave "virtually no weight" to Dr. Houk's prognosis for Plaintiff, i.e., "highly guarded," as well as her opinion regarding the severity of Plaintiff's work-related limitations, because, although supported by some clinical findings, the opinions were refuted by other findings, appeared to be based heavily on Plaintiff's subjective complaints and were inconsistent with other substantial evidence in the record.[30]   (R. 24-25).

In rejecting Dr. Houk's opinions, the ALJ, again, impermissibly substituted his own lay opinion for that of a psychological expert. In fact, the ALJ's rejection of Dr. Houk's opinions is more egregious than his previous rejections of the psychiatric opinions in the administrative file because

---

[30] The ALJ's reference to other substantial evidence in the record related to contemporaneous medical records of Dr. Ira Baumgartel, a medical doctor who treated Plaintiff for groin and neck lumps.  (R. 24).

the ALJ concedes Dr. Houk's opinions are supported by some of
her clinical findings.  As to the ALJ's reliance on the failure
of Dr. Houk's abnormal clinical findings to be documented in the
contemporaneous medical records of Dr. Ira Baumgartel, Dr.
Baumgartel is a medical doctor who treated Plaintiff for
complaints of neck and groin lumps.  Accordingly, Dr.
Baumgartel's focus was on Plaintiff's physical complaints, and
little significance, if any, can be placed on the absence of
notations relating to psychological symptoms.  In addition, as
noted previously, as a medical doctor, Dr. Baumgartel is not
qualified to diagnosis psychiatric disorders.  See Ross, supra.

IV

Turning to Plaintiff's psychiatric admission to Butler
Memorial Hospital in November 2008, the treating psychiatrist
diagnosed Plaintiff with bipolar disorder, depression,
generalized anxiety disorder with panic and adult antisocial
behavior, and rated Plaintiff's GAF score between 45 and 60.
The ALJ gave "very little weight" to the diagnoses as a result
of his determination the psychiatrist's opinion was "only
somewhat supported by clinical findings" and appeared to be
based heavily on Plaintiff's subjective complaints.  As to the
GAF range, the ALJ gave "virtually no weight" to the
psychiatrist's opinion based on his determination the clinical
findings were minimal, appeared to be based primarily on

28

Plaintiff's subjective complaints, and "is most inconsistent
with the other substantial evidence in record, including the
**recent clinical psychiatric assessments** of Dr. Baumgartel, Dr.
Crandall, and Dr. Elias." (emphasis added).  (R. 28).

Again, the ALJ impermissibly substituted his own lay
opinion for that of a psychiatric expert regarding Plaintiff's
diagnoses and GAF assessments.  With regard to the "recent
clinical psychiatric assessments" by Drs. Baumgartel, Crandall
and Elias, as noted by Plaintiff, all of these doctors are
medical doctors who treated Plaintiff for his complaints of neck
and groin lumps.  As such, they would not be qualified to
perform clinical psychiatric assessments of Plaintiff and it is
clear from their records that they did not do so.

V

Finally, the ALJ gave only minimal weight to the depressive
disorder and antisocial personality disorder diagnoses of Dr.
Mark Matta following his psychiatric evaluation of Plaintiff at
WW on January 2, 2009, and "virtually no weight" to the GAF
score of 49 assigned to Plaintiff by Dr. Matta because (a) Dr.
Matta is an osteopath, rather than a psychiatrist, (b) "most
actual" clinical findings were benign, and (c) the opinions were
inconsistent with other substantial evidence of record.  Once
again, the ALJ impermissibly substituted his opinion for that of
a psychiatric expert.

29

Osteopathic medicine is a branch of the medical profession. Osteopathic physicians are licensed to practice medicine and surgery in all 50 states and are recognized in 55 other countries. The training of osteopathic physicians in the United States is very similar to that of their medical physician counterparts. Osteopaths attend 4 years of medical school followed by at least three years of residency. www.wikipedia. org. Dr. Matta is licensed to practice medicine, and he is Board-certified in psychiatry. Therefore, the fact that Dr. Matta is an osteopathic physician, rather than a medical physician, is not a legitimate basis for the ALJ's decision to give "less value" to his opinions.

## VI

In sum, the ALJ's decision to give more weight to the opinion of a single non-examining psychological consultant than the consistent opinions of treating psychiatrists and the consultative examining psychologist was improper. Brownawell v. Commissioner of Social Security, 554 F.3d 352 (3d Cir.2008) (ALJ's disability determination was not supported by substantial evidence because he failed to give appropriate weight to the opinions of claimant's treating physician and consulting psychiatrist, and instead improperly favored the opinion of the

non-examining psychologist).  Under the circumstances, the ALJ's
decision is reversed.


                                    _William L. Standish_
                                    William L. Standish
                                    United States District Judge


Date: May /O, 2012